STATE OF MAINE                                    SUPERIOR COURT
ANDROSCOGGIN, ss.                                 CIVIL ACTION
                                                  DOCKET NO. CV-06-219

MAINE HUMAN RIGHTS          RECEIVED & FILED

                                    OCT 3 1 2008

                            ANDROSCOGGIN
                            SUPERIOR COURT
COMMISSION AND
ROBERT DUGGAN, JR.,

        Plaintiffs

v.                                                JUDGMENT (AMENDED)

SADDLEBACK, INC.,
INTEGRITY ELECTRICAL
INSTALLATION & SERVICE,
INC. AND SARGENT & SONS
BUILDERS, INC.,

        Defendants

## BEFORE THE COURT

This matter is before the court following a jury trial on June 16, 17 and 18,

2008 for a judicial determination of a remaining claim against Saddleback, Inc.,

brought under the Maine Human Rights Act, 5 M.R.S.A. §§ 4553(2) and 4633(2).

The Maine Human Rights Commission and Robert Duggan seek declaratory and

injunctive relief, along with damages, because they allege that Robert Duggan

was illegally fired in violation of the Whistleblowers' Protection Act and the

Maine Human Rights Act.

Plaintiffs' amended complaint alleged claims against Integrity, Saddleback

and Sargent. Plaintiffs asserted that Duggan's employer, Integrity, discriminated

against Duggan at the behest of Saddleback and Sargent in violation of the Maine

Human Rights Act (MHRA) and the Whistleblower's Protection Act (WPA) due

to Duggan's complaint to the Maine State Electrician's Examining Board (Board)

that Saddleback employees and others were performing unsafe electrical work

without a license in violation of the Maine State Electrical Code (Code). Plaintiffs

1

alleged that Integrity violated the WPA (Count I) and the MHRA (Count II) by threatening him with termination, terminating his employment and subsequently seeking to transfer him to a different job site, all because of his report to the Board. Integrity was defaulted on Counts I and II and judgment will be entered against it on both Counts. With respect to Saddleback, the Commission and Duggan alleged that Saddleback compelled or coerced Integrity to engage in unlawful MHRA employment discrimination and interfered with Duggan's exercise or enjoyment of the rights guaranteed or protected by the MHRA (Count III). This claim will be addressed below. Duggan also alleged in Counts IV and V that Saddleback (Count IV) and Sargent (Count V) tortiously interfered with Duggan's business relationship with Integrity by pressuring Integrity to fire him. Sargent defaulted on Count V. The jury found for Duggan on the claims of tortious interference with a business relationship and awarded him against each Saddleback and Sargent $ 42,000 in compensatory damages.

## FACTS

In the summer of 2004, Duggan was employed by Integrity as a Journeyman Electrician and Foreman and was working at Saddleback Maine Ski Resort on the snowmaking project and worked for Sargent & Sons, the general contractor for Saddleback, on the base lodge work. Saddleback also contracted with Snow Machines Incorporated (SMI), an out-of-state company, to perform the snowmaking installation. To save money, Saddleback let SMI use Saddleback laborers when SMI needed additional workers, even though Maine law required a Maine licensed electrician and SMI workers were not licensed.

Duggan worked through Integrity for both Sargent and Saddleback. Duggan was a skilled, competent electrician who performed his job well and was

regarded by his employer as being a hard, smart worker. Duggan observed Saddleback employees performing work on the site that was both unlicensed and unsafe. Duggan also observed Saddleback workers drinking beer on the job and reported it to his foreman Rick Morin. Duggan had two concerns: (1) electrical work with high voltage lines was being performed by persons with no electrical license and in violation of the Electrical Code; and (2) the work being done posed a serious risk of danger to the general public. Only Integrity had a license; Saddleback and SMI did not have a license. Duggan was not the only one with concerns about the illegal work. Many knew that illegal work was going on and were frustrated that the State had not come in to stop it. Duggan and others[1] reported this unlicensed and unsafe work but nothing was done.

On September 21, Duggan spoke about the illegal work to Brian Bunch, a Saddleback employee hired to oversee installation of snowmaking equipment and the lifts, whose response was, "We're a small mountain. We do what we want." Two days later, on September 23, Saddleback gave work to Tripp, another electrical contractor, and Bunch told Integrity they were happy with them, they did excellent work, but Bunch wouldn't elaborate beyond that.

Duggan spoke to Mike Carleton, the owner of Integrity, and Rick Morin, Integrity's general foreman, about the unlicensed and unsafe electrical work. On September 29, after he witnessed unlicensed workers backfilling boulders and debris on top of high voltage electrical lines in violation of the Electrical Code and observed disconnects done by unlicensed workers in the pump house, Duggan spoke with Morin and warned him he was going to call the State.

---

[1] Another employee of Integrity also reported the unlicensed and unsafe work but his employment was not terminated because the defendants did not know that he had also made a report to the State.

3

Duggan asked Morin to contact Carleton. Later that day, Duggan contacted the Maine State Electrician's Examining Board and reported what he reasonably believed to be unlawful and unsafe electrical activity on the part of Saddleback employees. Integrity did not fire Duggan that day for contacting the Board.

When Sargent asked Morin, who had called the State, Morin gave Sargent Duggan's name. Tom McAlister, General Manager of Saddleback, and Bunch were upset that Duggan had called the State and wondered "why would he bite the hand that feeds him." They were angry. Bunch was very upset and because the snowmaking project was already behind schedule and Bunch knew that the State had the ability to shut the whole project down.

After Duggan's report, Integrity's work was restricted to a single area at Saddleback. In addition, Sargent met with Morin and told him that Duggan was "gone" because he had made the report. He told Morin that this was "the kind of thing that was going to get Integrity fired from this job." Morin told Sargent that it would be illegal, but Sargent's response was that he did not care and Duggan was "gone." During a subsequent meeting with Morin and Carleton, Sargent again repeated that Duggan was "gone." Sargent initiated this conversation to relay to Carleton Saddleback's disappointment about why one of his employees would be calling the State electrical inspector. Bunch also met with Carleton and ordered Carleton to fire Duggan because of his call to the Board. Saddleback and Sargent had made clear to Integrity that they wanted Duggan gone. Carleton was very anxious about not losing the work at Saddleback. Integrity had a lot to lose if it lost the contract at the mountain.[2] On

_____

[2] Indeed, Integrity made a lot of money ("obscene amounts of overtime" as described by Carleton) during the months after Duggan was fired.

September 30, Carleton told Duggan that Saddleback wanted him fired and he asked if he could give Duggan a clean layoff. He then asked Duggan if he would take a transfer as an alternative to a layoff. Duggan refused. Integrity then decided to make Duggan take a day off the job site.

The next week Duggan was allowed to return but was told to keep his head down and not aggravate anybody over the unlicensed work. The work atmosphere was noticeably more hostile when Duggan returned to work. On October 7, there was an incident at Sarge's (a bar) when two SMI employees were staring at Duggan. Duggan approached them and raised the issue of unlicensed and unsafe work. Sargent complained to Integrity that the persons at Sarge's who were criticized for doing unlicensed work might harm Duggan. Saddleback and Sargent workers made other threats to Duggan.

On October 8, Integrity terminated Duggan's employment. Earlier that day, Carleton called Morin and said "we just lost the rest of the snowmaking work on the mountain." Morin told Duggan to call Carleton and to get his tools in case he was fired. When Duggan asked if he was getting fired, Carleton said "yes", and explained that Bunch of Saddleback was "wound up" because Duggan had told SMI employees what they were doing was illegal and Bunch had told him that Duggan had to be fired. Carleton told Duggan he could not come back to the cite and did not offer any transfer or other work. Subsequently, Duggan was offered short-term other work, which he refused.

## COUNT III

Count III alleges that Saddleback compelled or coerced Integrity to engage in unlawful Maine Human Rights Act discrimination in violation of 5 M.R.S.A. §

5

4553(10)(D) and that Saddleback interfered with enjoyment of rights granted or protected by the MHRA in violation of 5 M.R.S.A. 4633(2).

Although Integrity has been defaulted, the court will discuss Integrity's violations because they provide a foundation to understanding how it is that Saddleback also violated Duggan's rights under the MHRA. Integrity violated the MHRA, which provides in relevant part, that it is "unlawful employment discrimination . . . for any employer . . . to discharge an employee or discriminate with respect to . . . transfer . . . terms [or] conditions" because of previous actions taken by the employee that are protected by the WPA. 5 M.R.S.A. § 4572(1)(A). The WPA provides that no employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee, acting in good faith . . . reports orally or in writing to a public body what the employee has reasonable cause to believe is a violation of a law or rule . . . [or] a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. § 833(1)(A)(B).

There are three elements to a claim of unlawful retaliation: "(1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Costain v. Subury Primary Care, P.A.*, 2008 ME 142, ¶ 6. The first element was met by Duggan's complaint to the Board about Saddleback's unlicensed and unsafe electrical installation work. There is no question that this activity is the type of action afforded protection from discrimination by 26 M.R.S.A. § 833(1)(A). As to the remaining elements, Duggan's employment was terminated within one week of

6

his report to the Board. Temporal proximity, as here, between an employee's report and the subsequent discharge or transfer is "sufficient to raise an inference of causation" and establish plaintiff's prima facie case. *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 23, 915 A. 2d 400, 406. And, in addition, there are the statements that Duggan must be gone.

Once plaintiff makes his prima facie case of discrimination, a rebuttable presumption arises that the defendant Integrity retaliated against Duggan for engaging in WPA protected activity, which the court finds by a preponderance of the evidence that he did and Integrity has failed to produce any probative evidence to demonstrate nondiscriminatory reasons for the adverse employment action. Thus, judgment will be entered on Counts I and II against Integrity.

The evidence shows that Duggan engaged in protected activity by contacting the Board and reporting unlicensed and unsafe work. He experienced an adverse employment action in that he was first threatened with termination, then terminated and then offered an unsatisfactory transfer. The causal connection is established by the timing of Duggan's reporting activity in relation to the adverse job actions and statements by all of defendants, including Saddleback made in the same time period.

Section 4553(10) of the MHRA provides, in relevant part, that "unlawful discrimination includes . . . Unlawful employment discrimination as defined and limited by subchapter III . . . [and] compelling and coercing another to do any of such types of unlawful discrimination. . . ." 5 M.R.S.A. § 4553(10)(D). As discussed above, it is unlawful employment discrimination for an employer to discharge an employee because of actions taken by an employee that are protected by the WPA. 5 M.R.S.A. § 4572(1)(A). And, as discussed above, the

7

WPA protects an employee's good faith reports of violation of a law or rule or a condition that creates a health or safety risk. 26 M.R.S.A. § 833(1)(A, B). Thus, it is a violation of Section 4553(10)(D) for a person to compel or coerce an employer to fire its employee because the employee reported to a public body, such as the Electrical Board in this case, what Duggan reasonably believed to be a violation of a rule or law or a safety risk.

With regard to Section 4633(2), the MHRA gave Duggan the right not to be fired by Integrity because of his activity protected by the WPA. By making it clear to Integrity that it would lose work for Saddleback unless Integrity fired Duggan for his reporting, Saddleback interfered with Duggan's rights under the MHRA and thereby violated section 4633(2). See *Currie v. Industrial Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A. 2d 400, 408.

## CONCLUSION

The court concludes that Plaintiffs have proven that it is more likely than not that Saddleback and Sargent coerced or compelled Integrity to fire Duggan because of his previous activity protected by the Whistleblower Protection Act in violation of 5 M.R.S.A. §§ 4553(10)(D) and 4633(2) and that Integrity did in fact fire Duggan as a result of this coercion.

The entry is:

1. Pursuant to the jury's answers to written interrogatories submitted to them and their resulting verdict, the Clerk is hereby ordered to enter the following Judgment for the plaintiff, Robert Duggan, on Counts IV and V in the amount of $42,000 together with interests and costs on each count;

2. Pursuant to a default entered on Counts I and II against Integrity and for the Plaintiffs, the Clerk is hereby Ordered to enter the following Judgment for Plaintiffs on Counts I and II;

8

3.   Judgment is hereby entered against Saddleback in favor of the Maine Human Rights Commission and Robert Duggan on Count III;

4.   A declaratory judgment that Integrity and Saddleback's practices were unlawful and violations of the Maine Human Rights Act; Integrity and Saddleback, and all persons acting in concert with them, or at their direction, are enjoined from engaging in any policy or practice that retaliates against Robert Duggan for exercising his rights under the WPA or the MHRA; and back pay be awarded as an alternative to reinstatement given that the job is no longer available and Integrity has ceased operations;

5.   Backpay of $1,907. 36 together with interest against Integrity and Saddleback on Counts I, II and III;

6.   Civil penal damages against Integrity on Counts I and II and Saddleback on Count III in the amount of $7,500 on each Count; and

7.   Reasonable attorney's fees and costs against Integrity and Saddleback.


Date:  October 31, 2008

Joyce A. Wheeler, Justice

9

STATE OF MAINE                          SUPERIOR COURT
ANDROSCOGGIN, ss.                       CIVIL ACTION
                                        DOCKET NO. CV-06-219
                                        JAW - AND - 12/17/2009
MAINE HUMAN RIGHTS     RECEIVED & FILED
COMMISSION AND
ROBERT DUGGAN, JR.,          DEC 17 2008

        Plaintiffs          ANDROSCOGGIN
                            SUPERIOR COURT

        v.                              ORDER REGARDING
                                        ATTORNEYS FEES
SADDLEBACK, INC.,
INTEGRITY ELECTRICAL
INSTALLATION & SERVICE,
INC. AND SARGENT & SONS
BUILDERS, INC.,

        Defendants

## BEFORE THE COURT

This matter is before the court for consideration of a request for plaintiff's attorney's fees and litigation expenses following a successful jury trial on June 16, 17 and 18, 2008 and a successful judicial determination of non-jury issues. In the court's order of October 2008, the court made findings of fact on which it relies in the analysis of the claim for attorney's fees and expenses.

The evidence at trial was essentially the same for both the Maine Human Rights Act (MHRA) claims and the tort claims.[1] Although the tort claims required proof of intimidation, the MHRA claims required proof of compelling or coercing another to violate the MHRA, 5 M.R.S.A. § 4553(10)(D) and proof of interference, coercion or intimidation, 5 M.R.S.A. § 4633. Thus, the evidence for proof of the tortious interference claims and the claims under the MHRA was much the same for all claims.

---

[1] The court relies on its factual statement in the October 31, 2008 Order.

1

Contrary to defendant's argument, the claims in this case are so interrelated[2] that "attempts to allocate hours between claims may be unwarranted where an action involves related legal theories applied to a common core of facts." *Phetosomphone v. Allison Reed Group, Inc.*, 984 F. 2d 4, 7 (1st Cir. 1983). There is in this case a single core of facts applicable to either theory: Duggan's employer, Integrity, discriminated against Duggan at the behest of Saddleback and Sargent in violation of MHRA and the Whistleblower's Protection Act (WPA) due to Duggan's complaint to the Maine State Electrician's Examining Board (Board) that Saddleback employees and others were performing unsafe electrical work without a license in violation of the Maine State Electrical Code (Code), that Integrity violated the WPA and the MHRA by threatening him with termination, terminating his employment and subsequently seeking to transfer him to a different job site, all because of his report to the Board, and that Saddleback and Sargent compelled or coerced Integrity to engage in unlawful MHRA employment discrimination and also tortiously interfered with Duggan's business relationship with Integrity by pressuring Integrity to fire him. Duggan was successful on all of these claims that involved a common set of facts.

Pursuant to 5 M.R.S.A. § 4614 and M.R.Civ.P. 54(b), Attorney Rebecca Webber filed a detailed request for $79,777.07 in attorney's fees and expenses, after subtracting $11,204.00 for tort-related work and a reduction of $4,180 for the no-charged work.

---

[2] And, the conduct of the defendants is also so interrelated and produced "an indivisible injury", that the court concludes that the defendants are jointly and severally liable for the fees and expenses as outlined in this decision. *Koster v. Perales*, 903 F. 2d 131, 140 (2nd Cir. 1990).

Defendant Saddleback opposes Webber's application for attorney's fees on several grounds, including that most of her time was spent on the tort claims for which no attorney's fees are authorized while "the Maine Human Rights Commission litigated most of the case." Def's Opp, p.1. Saddleback also claims that Webber's fees include excessive, redundant or unnecessary hours accruing fees, and includes generic descriptions of time not capable of being properly assessed.

The court is indeed charged with examining an attorney's fee request to determine whether counsel exercised sound billing judgment. *Wilcox v. Stratton Lumber, Inc.*, 921 F. Supp. 837, 848 (D. Me. 1996). Webber and counsel of the Commission exercised extraordinary care to ensure that all matters critical to the case were covered by one of them and that they did not duplicate each other's actions. Webber has demonstrated the reasonableness of her rates and hours submitted in her application for fees. The court has scrutinized her billing records and her explanation of how she and counsel for the Commission divided up the work to be accomplished and finds that she acted responsibly and the resulting fees are reasonable.

Saddleback points to what it describes as unnecessary conferences with Attorney Gause of the Commission, but the court rejects the argument that this could only result in duplication of effort by attorneys. These conferences led to a division of work so as to avoid duplication and wasted resources. Webber and Gause divided responsibility for taking depositions, saving defendant depositions costs for which the Commission paid. Webber and Gause also split up witnesses during discovery and at trial. Gause was the only attorney to interview the State Electrical Inspector and to obtain an affidavit for Integrity

3

Foreman Rick Morin. Morin's affidavit was used to both defeat Saddleback's Motion for Summary Judgment and at trial. None of this shows up in Webber's fee petition precisely because it was delegated to the Commission during a conference between Gause and Webber. They also divided up the work responding to Saddleback's motion for summary judgment. Attorney Webber prepared the detailed factual section and the supporting statement of facts, work that was later used again for the trial brief and in the brief to the law court. Although both Gause and Webber signed the trial brief, they divided up responsibility for certain portions of the brief, just as they divided up responsibility for opening and closing statements, all to avoid duplication. Attorneys Gause and Webber should be commended for the lengths to which they went to avoid duplication and to ensure that their clients' cases went to the court in an expeditious manner.

Saddleback also argues that it was only one defendant and it should not shoulder all of the fees that Duggan incurred in litigating against the other defendants. However, this ignores the fact that only Saddleback vigorously defended itself against Duggan's claims. Integrity and Sargent defaulted early in the litigation. Moreover, joint and several fee liability is a proper exercise of the court's discretion. See *Webb v. Dyer County Bd. of Ed.*, 471 U.S. 234, 244 n. 20, 105 S. Ct. 1923, 1929 n. 20, 85 L. Ed. 2d 233 (1985). See also *Anrst v. Estes*, 8 A. 2d 201, 203 (Me. 1939). According to *Wyman v Secretary of State*, 625 A. 2d 307, 312 (Me. 1993), "the awards are to be guided by substantive liability rules, and should reflect the defendant's degree of responsibility for the injury suffered by the plaintiff." *Id.* at 312-13 (citations and quotations omitted). Here, not only was Saddleback engaging in the illegal and dangerous electrical work to save money,

4

but Saddleback was also pressuring Sargent and Integrity to have Duggan fired. Saddleback was the entity most responsible for Duggan's termination; accordingly, it is appropriate that the responsibility for the fees not be divided up and instead be awarded jointly and severally.

Saddleback further argues that Webber's services were unnecessary and redundant because the Commission was pursuing Duggan's MHRA claims. The Commission could not adequately represent Duggan in her individual claims. The Commission represents the interests of the State of Maine. Its actions were taken for the State of Maine and for the use of Duggan. Duggan has a right to counsel to represent him individually. 5 M.R.S.A. § 4613(1).

Saddleback criticizes Webber's attempt to recover for fees spent pursuing the tortious interference claim. Saddleback dismisses what it calls Webber's arbitrary determination that $11,204 were expended on tort claims and discounting her fees by this number. Yet, Saddleback does not identify any fees that should be excluded, but simply argues that the fees should be reduced by $15,995 for each of the two tort claim counts. The court considers the claims so interrelated that it would not be fruitful to attempt further segregation of Duggan's claims. As stated before, the elements of the MHRA claim and the tort claim are virtually identical, and Duggan was successful on all claims so there is no need to separate out the successful from the unsuccessful claims or to separate out the defendants because the witnesses were the same regardless of the claim or the defendant.

Finally, Saddleback argues against what it describes as "block billing" practice of Webber so as to evade meaningful judicial review. The court is very able to read and understand the billing entries. Each entry is about a particular

5

event, whether it was a discovery conference with the court, drafting a subpoena and deposition notice, and so forth. No further specificity is required.

Finally, Saddleback argues that if the court is not willing to significantly reduce Webber's fees, the court should grant it a evidentiary hearing with discovery to determine if Webber is entitled to the fees and costs she seeks and to resolve the factual issues in dispute. Yet, Saddleback has not identified what factual issues are in dispute and how an evidentiary hearing would advance the court's inquiry. And, the court is mindful that it should avoid a second major litigation over the fee petition. See *Koster v. Perales*, 903 F. 2d 131, 140 (2d Cir. 1990); *Webb v. Dyer County Bd. of Ed.*, 471 U.S. 234, 244 n. 20, 105 S. Ct. 1923, 1929 n. 20, 85 L. Ed. 2d 233 (1985).

The court considered most, if not all of the factors relevant to how many hours were reasonably spent on this case. The court considered the factors identified in *Colony Cadillac & Oldsmobile, Inc. v. Yerdon*, 558 A. 2d 364, 368 (Me. 1989); *Mancini v. Scott*, 2000 ME 19, ¶ 10, 744 A. 2d 1057, 1061 (citing *Poussard v. Commercial Credit Plan, Inc. of Lewiston*, 479 A. 2d 881, 883 (Me. 1984)). The court finds that the time spent by the lawyers and paralegal is reasonable considering the time and labor spent on the case from summary judgment, through trial and than an appeal filed by Saddleback. This case involved novel issues, including the extent of coverage and the interpretation of 5 M.R.S.A. § 4553(10)(D) and 5 M.R.S.A. § 4633. Employment law expertise was vital to this case and required, from time to time, preclusion of other employment. The hourly fee of Attorney Webber and her associate are comparable, if not lower than, the customary rates charged by other Maine attorneys with similar experience in employment litigation in Maine. Attorney Webber took a substantial risk in taking this case

6

on a contingent fee basis. The circumstances under which Attorney Webber came into this case required her to get up to speed quickly and to promptly prepare an amended complaint. This priority work inevitably delayed other legal work at that time. Success in this case for Duggan was complete. Attorney Webber's experience, reputation and ability were apparent in her handling of this case. Because the lost back pay wages in this case were small, and the MHRA damages were limited due to the size of Integrity, and the fact that Saddleback was not a direct employer, this case was not desirable when compared to cases with larger potential MHRA damages. Attorney Webber did not know Duggan before this case, thus this case required additional time for trial preparation with Mr. Duggan. After considering all of the factors, the court concludes that Duggan's attorney's fees are reasonable. Accordingly, Duggan is awarded the attorney's fees and expenses requested.

The entry is:

1.      Saddleback is Ordered to pay forthwith the Bill of Costs approved in July 2008;

2.      Saddleback is Ordered to pay the Bill of Costs submitted subsequent to the appeal in the amount of $476.50 within 30 days of this Order;

3.      Saddleback is Ordered to pay pre-judgment interest pursuant to 14 M.R.S.A. § 1602-B(3) on the amount of the judgment against it, which includes the award by the jury of $42,000, plus $7,500 of MHRA penalties, plus $1,907.36 of lost pay, plus this award of attorney's fees. The total amount on which interest is due is: $131,184.43. The interest rate to be applied is: 7.36%. The amount due in pre-judgment interest is therefore: $9,655.17.

4.      Saddleback is Ordered to pay Duggan post-judgment interest pursuant to 14 M.R.S.A. § 1602-C on the amount of the judgment against it, which includes the award by the jury of $42,000, plus $7,500 of MHRA penalties, plus $1,907.36 of lost back pay, plus this award of attorney's fees. The total amount on which interest is due is: $131,184.43. The interest rate to be applied is: 9.42%. The total amount due in post-judgment interest is therefore: $12,357.57.

7

5. Saddleback is Ordered to pay the following attorney's fees and litigation expenses to Duggan's counsel within 30 days of this order:

| | | |
|---|---|---|
| Attorney's fees for Attorney Webber | $ | 76,300.00 |
| Attorney's fees for Attorney Buck | $ | 714.00 |
| Paralegal fees of Anne Leblanc | $ | 2,264.00 |
| Expenses | $ | 499.07 |
| TOTAL: | $ | 79,777.07 |

Date: December 16, 2009

Joyce A. Wheeler, Justice

8